UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  vs.<br><br>JOSE MUNOZ,<br><br>  Defendant. | MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS<br><br>Case No. 2:14-CR-154<br><br>Judge David Nuffer |

An evidentiary hearing on Defendant's Motion to Suppress[1] was held September 15,

2015.[2] Following the evidentiary hearing, the parties addressed the issues in the form of draft

orders,[3] as instructed at the conclusion of the hearing. After a thorough review and consideration

of the drafts submitted by the parties, the previously-scheduled motion hearing is unnecessary.

For the reasons stated below, the Motion to Suppress is DENIED.

**TABLE OF CONTENTS**

FINDINGS OF FACT..................................................................................................................... 2
 I. The FBI Investigation ......................................................................................................2
 II. The Traffic Stop..............................................................................................................7
DISCUSSION ............................................................................................................................... 10
 I. The Traffic Stop and Impounding of the Vehicle Were Reasonable................................10
 II. The Seizure of the $20,000 Was Reasonable..................................................................12
 III. The Stop and Seizure Were Also Reasonable Under the Collective Knowledge Doctrine 13
CONCLUSION.............................................................................................................................. 15
ORDER ......................................................................................................................................... 16

---

[1] Docket no. 346, filed July 31, 2015.

[2] *See* Minute Entry, docket no. 366, filed Sep. 15, 2015.

[3] *See* Proposed Memorandum Decision and Order, docket no. 408, filed Nov. 23, 2015 (at the Sep. 15, 2015 hearing, the government was ordered to draft a proposed order including findings of fact and conclusions of law, and the defense was ordered to subsequently redline that order to propose any desired alterations in the findings and conclusions).

## FINDINGS OF FACT

### I.    The FBI Investigation

In October of 2011, the Federal Bureau of Investigation (FBI) took over a drug investigation which had been initiated by the Salt Lake City Police Department.[4] Specifically, the investigation had been opened by then-Salt Lake City Detective Kevin Ford, who, at the time, was a member of the FBI's Safe Streets Task Force.[5] The investigation was begun in order to reveal the drug trafficking activities of a local street gang known as La Raza and, as part of the investigation, agents focused on an auto shop that was believed to be utilized as a stash house where illegal narcotics were received, packaged and later distributed.[6] The auto shop was located at 3390 West 1987 South in Salt Lake City.[7]

As part of the investigation relating to the activities at the auto shop, in July of 2012, the FBI installed pole cameras around the shop.[8] The pole cameras were installed in order to observe the vehicle traffic coming and going from the shop as well as those individuals coming and going.[9] On April 25, 2013, the FBI also obtained warrants which authorized the installation of a closed circuit television (CCTV) and microphones in a locked room in the auto shop where agents believed the suspected drug trafficking activities were occurring.[10]

---

[4] Transcript of 9/15/15 Evidentiary hearing, 7:22–23, docket no. 374, filed Sep. 23, 2015.

[5] Id. 7:24–8:8.

[6] Id. 8:14–25.

[7] Id. 9:6–7.

[8] Id .9:10–12.

[9] Id. 9:15–20.

[10] Id. 9:21–10:12.

From May 1, 2013, through June 29, 2013, the CCTV and accompanying audio, when on, were constantly monitored by the FBI.[11] Because most of the conversations being heard and recorded were in Spanish, Spanish-speaking linguists were used by the FBI to monitor the conversations.[12] As part of the monitoring, those linguists relayed relevant information to non-Spanish speaking agents and officers who were also present in the wire room.[13]

During the period of interception, law enforcement officers monitoring the CCTV and microphones observed Samuel Covarrubias-Velazquez receiving and breaking down drugs into smaller packages.[14] Covarrubias-Velazquez was also observed storing the drugs in the locked room and leaving the auto shop with drugs, apparently to deliver the drugs to others.[15]

On three separate occasions, after the CCTV and microphones had been installed, law enforcement officers surreptitiously entered the locked room and took small samples of the drugs being stored there, verifying that the samples were controlled substances.[16] Photographs of the drugs were also taken, and the drug packages which were located were also weighed.[17]

An individual identified as Carlos Tenengueno was seen on multiple occasions delivering drugs to the locked room where the CCTV and microphones were located.[18] Agents had received information from confidential sources that Tenengueno was working as a drug runner for the

---

[11] *Id.* 10:20–11:2.

[12] *Id.* 11:4–9.

[13] *See Id.* 25:12–14.

[14] *Id.* 11:13–16.

[15] *Id.* 11:15–18.

[16] *Id.* 11:19–25.

[17] *Id.* 11:25.

[18] *Id.* 12:3–10.

defendant, Jose Munoz.[19] During the period of interception, however, Munoz was never seen inside the locked room or anywhere else near the premises other than on the night in question.[20]

On June 13, 2013, at approximately 10:04 p.m., Samuel Covarrubias-Velazquez arrived at the auto shop, driving a VW.[21] Shortly thereafter, a white SUV arrived.[22] Two individuals, identified as Carlos Tenengueno and Alejandro Arciniego, then got out of the SUV.[23] Although unseen at that time, a third male apparently got out of the SUV as well.[24] All of this activity was observed on the pole cameras by Task Force Officer Kevin Ford who was working in the wire room at that time.[25]

Covarrubias-Velazquez got out of his car, carrying a package.[26] He, along with Tenengueno and Arcienega, entered the auto shop and went to the locked room.[27] There, Covarrubias-Velazquez unwrapped the package and placed it on a scale to be weighed.[28] Based on his knowledge of the investigation, TFO Ford believed the package to contain illegal narcotics.[29] Although the view from the CCTV was blocked by Arcienega, Covarrubias-Velazquez apparently retrieved cash from a satchel. Then he, Arcienega, and Tenegueno then stood around the table, counting the cash.[30] During this time, Tenengueno, Covarrubias-

---

[19] *Id.* 12:23–13:3.

[20] *Id.* 13:11–13.

[21] 6/13/13 Pole Camera & CCTV Video, Government Exhibit 1, received at the 9/15/15 hearing, at 10:00:54; Transcript 18:20–21.

[22] Ex. 1 at 10:01:07.

[23] Ex. 1 at 10:01:12; Transcript 18:22–24.

[24] Transcript 18:22–25.

[25] *Id.* 18:1–2, 17–19; *see also Id.* 24:4–11.

[26] Ex. 1 at 10:01:15; *see* Transcript 19:1–3.

[27] Transcript 19:3–4.

[28] Ex. 1 at 10:04:27–10:05-29; Transcript 19:17–20; *see also* Transcript 24:17–22.

[29] Transcript 19:18–19.

[30] Ex. 1 at 10:05:45-10:21:21; *see* Transcript 19:20–25.

Velazquez and Arcienega were all observed on their cell phones.[31] At one point, Covarrubias-Velazquez contacted someone to inform that individual that he was short on money and to request direction on how to proceed.[32] Again, TFO Ford observed all of this activity as he was monitoring the CCTV from the wire room and as he received information from the linguists.[33] Ford was also advised by the linguists that the cash counted out by Covarrubias-Velazquez, Tenengueno and Arcienega totaled $20,000.00.[34]

At 10:16 p.m., TFO Ford observed a Hummer driving by the shop.[35] It also appeared to Ford that Tenengueno made a phone call at approximately the same time as the Hummer's drive-by.[36] According to the linguists, Tenengueno was indicating to someone on the phone that the money was short.[37]

At 10:21 p.m., the money had been counted and put into three piles.[38] Those piles were secured with rubber bands and all three bundles were placed in a white bag with red markings.[39] The bag appeared to be a paper bag that was open on top, with looped handles.[40] Tenengueno took the bag and he, Arcienega, and Covarrubias-Velasquez left the locked room.[41] Again, TFO Ford observed all of this activity as he monitored the CCTV from the wire room.[42]

---

[31] *See generally* Ex. 1; *see also* Transcript 20:12–13; 24:23–25; 26:5; 26:10–18; 27:7–11.

[32] Transcript 26:10–18; *see* Ex. 1 at 10:12:46–10:13-50.

[33] Transcript 18:1–2, 17–19; *see also Id.* 25:7–11.

[34] *Id.* 20:7–9 *see also Id.* 25:12–14.

[35] *Id.* 20:15–16; *see* Ex. 1 at 10:16:30.

[36] Transcript 20:13–16 and 26:19–22; *see* Ex. 1 at 10:16:34–10:19:40.

[37] Transcript 26:19–27: 2.

[38] Ex. 1 at 10:21:21; *see* Transcript 20:19–22 and 27:16–19.

[39] Ex. 1 at 10:21:38–10:22:15; *see* Transcript 20:22–23 and 27:18–23.

[40] Ex. 1 at 10:22:10.

[41] Ex. 1 at 10:22:30; *see* Transcript 20:23–21:2.

[42] Transcript 18:1–2.

At 10:23 p.m., the previously unseen male, who had apparently been doing surveillance outside the auto shop, got back into the white SUV, into the driver's seat.[43] Arcienega then came out of the auto shop and got into the front passenger seat of the white SUV; the SUV then left.[44] Covarrubias-Velasquez and Tenengueno were also seen walking out; Tenengueno was carrying the loop-handled white bag with red markings.[45] TFO Ford observed all of this activity as he monitored the pole cameras from the wire room.[46]

At 10:24 p.m., a Hummer drove up to the driveway of the auto shop and Tenengueno got in the rear left side of the vehicle, still carrying the loop-handled white bag with red markings.[47] TFO Ford believed the vehicle to be the same Hummer he had observed passing by the auto shop several minutes earlier.[48]

Mr. Munoz testified that on the evening of June 13, 2013, he was at the movies with his ex-wife.[49] While there, Munoz said he received a call or message from Carlos Tenengueno asking for a ride because Tenengueno had been drinking and wanted to go home.[50] Munoz further testified that Tenengueno asked to be picked up at an auto shop in the area of 1900 South and 3300 West.[51] Munoz then drove to that location and picked up Tenengueno.[52]

Based on his knowledge of the investigation, the activity he had observed on the CCTV and pole cameras, and the information provided by the linguists, TFO Ford believed that the

---

[43] Ex. 1 at 10:23:26; *see* Transcript 21:4–6.

[44] Ex. 1 at 10:23:45; Transcript 21:7–8 and 28:7–9.

[45] Ex. 1 at 10:24:20; *see* Transcript 21:8–9 and 28:12–16.

[46] *See* Transcript 18:1–2.

[47] Ex. 1 at 10:24:33; *see* Transcript 21:9–11 and 28:12–16.

[48] Transcript 21:12–13 and 28:13–14.

[49] *Id.* 50:6–12.

[50] *Id.* 50:16–51: 3.

[51] *Id.* 50:19–24.

[52] *Id.* 51:6–9.

$20,000 cash given to Tenengueno by Covarrubias-Vazquez was payment for illegal narcotics.[53] As a result, Ford contacted the surveillance team that had previously been set up on the auto shop and directed the team to follow the Hummer.[54] Ford believes he spoke to Detective Devon Stuz with the Salt Lake City Police Department who was also a member on the FBI's Safe Streets Task Force and on the surveillance team.[55] Ford asked Detective Stuz to maintain visual contact on the Hummer, and further requested that Stuz contact a uniformed officer and have the officer conduct a wall stop on the vehicle.[56] A wall stop occurs when a uniformed officer finds a valid reason to stop a vehicle and develops probable cause to search the vehicle on his or her own, without being given any background on the underlying investigation.[57]

## II.    The Traffic Stop

Detective Stuz made contact with Officer Cale Lennberg, a canine officer with the Salt Lake City Police Department who had been working in that capacity for approximately 13 years.[58] Officer Lennberg was asked to do a wall stop, which he understood to mean that he would find, on his own, a valid reason to stop the vehicle and investigate as far as possible.[59] Officer Lennberg was not given any information by Detective Stuz other than a description of the vehicle—a red Hummer, and its location.[60]

---

[53] *Id.* 28:17–20.

[54] *Id.* 28:24–29:1.

[55] *Id.* 29:2–8.

[56] *Id.* 29:12–21.

[57] *Id.* 29:17–21.

[58] *Id.* 30:1–4, 32:7–13, and 23–25.

[59] *Id.* 33:14–19 and 34:2–13.

[60] *Id.* 34:12–15 and 35:5–10.

Officer Lennberg, who was southbound on Redwood Road, located the red Hummer, at California Avenue and Redwood Road.[61] The vehicle was travelling eastbound on California and then turned southbound onto Redwood Road.[62] The Hummer was initially travelling in the outside lane, and then, according to Lennberg, made a lane change to the inside lane without signally properly.[63] Specifically, after the vehicle began its lane change, according to Lennberg, it signaled with two blinks; Utah law requires a full two seconds of signaling before the lane change is initiated.[64] Defendant testified that he signaled properly because he was aware of the law requiring a signal of two seconds prior to changing lanes as the result of 35 prior traffic tickets.[65]

Based on the traffic violation, Officer Lennberg initiated a traffic stop at approximately 10:30 p.m.[66] The red Hummer pulled over without incident.[67] Prior to initiating the stop, Lennberg had called for a back.[68] At some point, Officer Chris Nielsen arrived to assist.[69] Lennberg approached the vehicle asked the driver for his license, the vehicle registration and a proof of insurance.[70] He also explained the reason for the stop.[71] The driver, later identified as the defendant, Jose Munoz, told Officer Lennberg that his driver's license had been suspended.[72]

---

[61] *Id.* 34:16–18.

[62] *Id.* 34:19–21 and 43:24–25.

[63] *Id.* 35:15–21; *see* UTAH CODE ANN. § 41-6a-804.

[64] *Id.* 36:1–16, and 44:8–11; *see* UTAH CODE ANN. § 41-6a-804.

[65] Transcript 52:6–23.

[66] *Id.* 37:5–10 and 46:14–15.

[67] *Id.* 37:11–13.

[68] *Id.* 37:16–20 and 44:23–45: 2.

[69] *Id.* 45:3–10.

[70] *Id.* 38:2–6 and 45:11–14.

[71] *Id.* 38:6 and 45:14–16.

[72] *Id.* 38:9–12, 39:5–6, and 45:17–19; *see Id.* 52:34.

Lennberg and Officer Nielsen also found that the vehicle was improperly registered because Mr.

Munoz, who had purchased the vehicle previously, was still driving on the previous owner's

license plates.[73] Driving on an invalid driver's license and improper registrations are both

violations of Utah law.[74]

At that point, Officer Lennberg explained to Mr. Munoz that he was issuing a citation and

impounding the vehicle.[75] Because of the registration violation, Lennberg did a "state tax"

impound on the vehicle.[76] Lennberg explained to Munoz that he was impounding the vehicle,

and, according to Officer Nielsen's report, Mr. Munoz was asked if there was anything in the car

he wanted to retrieve.[77] Munoz stated that he wanted his cell phone, and officers allowed him to

take the phone.[78] Munoz and his party were then advised that they were free to leave.[79]

Officers then began an inventory of the vehicle pursuant to Salt Lake City Police

Department policy.[80] According to the policy, officers must go through the vehicle, check for

valuable items which could be lost or stolen and document what is found.[81] Anything of

significant value is booked into evidence so it is not lost or stolen.[82]

---

[73] *Id.* 38:13–17, 45:22–461, and 52:3–5; *see* UTAH CODE ANN. § 41-1A-221.

[74] Transcript 38:18–22.

[75] *Id.* 39:1–2.

[76] *Id.* 39:8–13.

[77] *Id.* 41:8–11 and 47:11–13.

[78] *Id.* 41:11–12.

[79] *Id.* 41:12–13.

[80] *Id.* 39:15–16 and 40:17–19; *see* Salt Lake City Police Impound Policy, Government Exhibit 2, received at the 9/15/15 hearing.

[81] Ex. 2; *see also* Transcript 40:22–25.

[82] *See* Ex. 2; *see also* Transcript 41:1–2.

As Officers Lennberg and Nielsen conducted the inventory, Mr. Munoz was present, arranging for a ride to pick him up.[83]

During the inventory, officers located a paper bag containing a large amount of cash; the bag was found behind one of the seats.[84] The white bag had loop handles on either side, was square and was open.[85] When Officer Lennberg looked inside the bag, he saw several bundles of money.[86] There were three bundles of cash; two bundles containing $7,000 and one bundle containing $6,000, for a total of $20,000.[87]

## DISCUSSION

In making a determination on whether to grant or deny defendant's Motion to Suppress, two issues must be addressed. First, the traffic stop of defendant's vehicle must have been reasonable under the Fourth Amendment; and second, the seizure of the $20,000 in the vehicle must have been lawful.

### I.   The Traffic Stop and Impounding of the Vehicle Were Reasonable

In analyzing the constitutionality of a traffic stop under the Fourth Amendment, the Court of Appeals for the Tenth Circuit has stated that such a stop is justified at its inception "if the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction."[88] In reviewing the "reasonable suspicion" prong, the Court has further stated that "[w]hether reasonable suspicion exists is an objective

---

[83] Transcript 41:15 and 48:3–6.

[84] *Id.* 41:23–25.

[85] *Id.* 42:5–9.

[86] *Id.* 42:10–11.

[87] *Id.* 42:23–43:3.

[88] *United States v. Salas*, 756 F.3d 1196, 1200–01 (10th Cir. 2014) (quoting *United States v. Ozbirn*, 189 F.3d 1194, 1197–98 (10th Cir. 1999)) (citations &quotations omitted).

inquiry determined by the totality of the circumstances, and an officer's subjective motivation for the stop plays no role in ordinary [reasonable suspicion] Fourth Amendment analysis."[89]

In the instant case, the government asserts that the traffic stop was valid at its inception because defendant failed to signal for two seconds before initiating a lane change, a violation of Utah law.[90] Officer Cale Lennberg testified that as he followed the defendant's vehicle southbound on Redwood Road, the defendant moved from the outside lane to an inside lane, but did not signal until after initiating the lane change. In addition, Officer Lennberg testified that defendant did not signal for the required two seconds, but rather, for two blinks only. In contrast, defendant testified that he did properly signal; he had seen the officer's vehicle and was aware of the law on signaling as a result of his 35 prior traffic tickets.

Based on observations of the demeanor and testimony at the hearing, Officer Lennberg's testimony regarding the traffic stop is credible and the defendant's is not. Officer Lennberg had reasonable articulable suspicion that defendant had committed a traffic violation.[91] The traffic stop, therefore, was valid and did not violate the Fourth Amendment. In addition, it is undisputed in the record that defendant's driver's license had been suspended and that the Hummer he was driving was improperly registered, although the license and registration are not bases for validating the stop because they were not determined until after the stop[92] But as a result, impounding the vehicle was reasonable in order to assure that the vehicle would be properly

---

[89] *Id.* at 1201 (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)) (alternation in original).

[90] *See* UTAH CODE ANN. § 41-6a-804.

[91] *See* *United States v. Broomfield*, 201 F.3d 1270, 1273 (10th Cir. 2000) (stating that the credibility of witnesses in a motion to suppress evidence is a matter for the trial court).

[92] *See* UTAH CODE ANN. §41-1a-221.

registered in the future, therefore complying with Salt Lake City Police Policy III-400 which states that vehicles may be impounded "as a means of enforcing local and State laws."[93]

## II.    The Seizure of the $20,000 Was Reasonable

The next issue is whether Officers Lennberg and Nielsen improperly seized the $20,000 found in defendant's impounded vehicle. Officer Lennberg testified that the money was seized pursuant to an inventory of the vehicle. It is well established that an inventory is a well-defined exception to the search warrant requirement and as such, is considered a routine noncriminal procedure, to be judged by a standard of reasonableness under the Fourth Amendment.[94] This routine practice by police serves "strong governmental interests in protecting the property while it [is] in police custody; in protecting the police from claims about lost or stolen property; and in protecting the police from potential danger."[95] An inventory, however, must adhere to standard procedures.[96]

In this case, the standardized procedure for inventories for the Salt Lake City Police Department is set forth in III-400, which provides in pertinent part:

> A thorough vehicle inventory will be conducted on all state tax & city impounds. The vehicle inventory shall include:
>> The interior of the vehicle, including under the seats, the glove box, etc.
>> Under the hood.
>> The trunk, when possible.
>> All closed containers, i.e., sacks, bags, boxes, etc.
> The officer will remove all valuables from the vehicle and place them in evidence for safekeeping. . . .[97]

---

[93] *See* Ex. 2.

[94] *South Dakota v. Opperman*, 428 U.S. 364, 369–72 (1976).

[95] *United States v. Kornegay*, 885 F.2d 713, 717 (10th Cir. 1989); *see Colorado v. Bertine*, 479 U.S. 367, 372 (1987).

[96] *See Opperman*, 428 U.S. at 375-76; *Bertine*, 479 U.S. at 372.

[97] Ex. 2.

Officer Lennberg testified that he followed those procedures, and his testimony is credible.[98] Specifically, Lennberg testified that as he checked the passenger compartment of the vehicle, he located an open paper bag which contained U.S. currency. None of the occupants of the vehicle claimed the money, and the money, therefore, was seized and placed in evidence for safekeeping as per departmental policy.[99] Officer Lennberg, therefore, properly followed his agency's standardized procedure and the money was lawfully seized.

### III.      The Stop and Seizure Were Also Reasonable Under the Collective Knowledge Doctrine

Even if the stop of defendant's vehicle was unsupported by reasonable suspicion on the part of Officer Lennberg stemming from a traffic violation, or that the seizure of the cash by Officers Lennberg and Nielsen was accomplished without following proper inventory procedures, defendant's Motion to Suppress still must be denied. The stop of defendant's vehicle and the subsequent seizure of the $20,000 in cash were reasonable under the collective knowledge doctrine and therefore, the Fourth Amendment was not violated.

As an initial matter, it is well established, under the automobile or *Carroll* exception to the search warrant requirement, that police may stop and search a car if they have probable cause to believe the vehicle contains contraband or evidence of a crime.[100] Such a stop and search may occur "regardless of whether a traffic violation has occurred or a search warrant has been

---

[98] *See Broomfield*, 201F.3d at 1273.

[99] *See* Ex. 2.

[100] *United States v. Benard*, 680 F.3d 1206, 1210 (10th Cir. 2012); *United States v. Chavez*, 534 F.3d1338, 1343–45 (10th Cir. 2008).

obtained."[101] "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence."[102]

If an officer conducting a traffic stop and subsequent search of a vehicle is not "aware of the facts establishing probable cause," he may still lawfully stop and search the vehicle under the collective knowledge doctrine "so long as he is acting on instructions delivered by an officer who has probable cause."[103] Because Officer Lennberg was instructed to make a wall stop of defendant's vehicle by Task Force Officer Ford, through Detective Stuz, under the collective knowledge doctrine, Lennberg would have had probable cause to stop and search the vehicle if Officer Ford had had probable cause to believe the vehicle contained contraband or evidence.

Officer Ford did have such probable cause, and therefore, the collective knowledge doctrine applies. Ford himself had initiated the investigation into the drug trafficking activities of La Raza, and was familiar with the activities at the auto shop. Ford was familiar with Samuel Covarrubias-Velazquez and Carlos Tenengueno, having previously seen both conducting drug transactions in the locked room. On the night of June 13, 2013, Ford was working the wire room, monitoring the CCTV and pole camera video feeds. Ford saw Samuel Covarrubias-Velazquez and Carlos Tenengueno arrive at the auto shop and go into the locked room where Covarrubias-Velazquez unwrapped and weighed a package containing what Ford reasonably believed to be controlled substances. Ford then observed Covarrubias-Velazquez pay Tenengueno cash, and was advised by the linguists that the cash totaled $20,000. Tenengueno placed the money into a white sack with red markings, left the auto shop and got into a Hummer which had pulled up

---

[101] *Benard*, 680 F.3d at 1210.

[102] *Id.* (quoting *Chavez*, 534 F.3d at 1343–45.

[103] *Benard*, 680 F.3d at 1210; *see United States v. Cervine*, 347 F.3d 865, 871 (10th Cir. 2003) (stating that probable cause can rest upon the collective knowledge of all of the officers involved in the criminal investigation, rather than solely on that of the officer who actually makes the arrest).

outside. Ford then contacted surveillance and instructed them to follow the Hummer and have a uniformed officer conduct a wall stop on the vehicle.

Officer Ford had probable cause to believe that the $20,000 in cash was evidence of a drug trafficking crime. Furthermore, Ford had probable cause to believe the cash was in the Hummer that had picked up Tenengueno at the auto shop. Under the collective knowledge doctrine, Ford's knowledge could be imputed to Officer Lennberg, and therefore, Lennberg had probable cause to stop the vehicle and search the vehicle under the automobile exception to the search warrant requirement. Therefore, the stop of defendant's vehicle and the seizure of the $20,000 were reasonable under the Fourth Amendment.

## CONCLUSION

Officer Lennberg had reasonable suspicion that defendant had violated Utah traffic laws, and, therefore, the stop of defendant's vehicle was lawful. Furthermore, the impounding of the vehicle and the subsequent inventory were conducted lawfully, and therefore, the seizure of the $20,000 in cash was reasonable. In addition, the stop of defendant's vehicle and subsequent seizure of the money was also reasonable under the collective knowledge doctrine based on the finding that Task Force Officer Kevin Ford had probable cause to believe defendant's vehicle contained evidence of a crime.

**ORDER**

Based on the above findings and conclusions, the Motion to Suppress[104] is DENIED.

IT IS SO ORDERED.

Dated this 24th day of November, 2015.

BY THE COURT:

David Nuffer
United States District Court Judge

---

[104] Docket no. 346, filed July 31, 2015.